AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>IN THE MATTER OF THE SEARCH OF: 3501<br>MEADOW AVENUE, CINCINNATI, OHIO 45211 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 1:21-mj-176

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 922(g)(1);1512(c)<br>(2);1503; 371 and 1503; 1512<br>(b)(2); 1512(k); 1623(a) | Felon in possession of firearm or ammunition; Witness tampering; Obstruction of justice; Conspiracy to commit obstruction of justice; Witness tampering; Conspiracy to commit witness tampering; Perjury |

The application is based on these facts:

See attached affidavit of ATF Special Agent Edward Schaub.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____*)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Edward Schaub, Special Agent, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

__via FaceTime video_____ *(specify reliable el*

Date: **Feb 24, 2021**

_____
Karen L. Litkovitz
**United States Magistrate Judge**

City and state: Cincinnati, Ohio

## ATTACHMENT A

*Property to be searched*

The property to be searched is **3501 MEADOW AVENUE, CINCINNATI, OHIO 45211,** further described as a light-colored single-family residence with a front porch and the number "3501" affixed to the front, as shown below:



## ATTACHMENT B

*Property to be seized*

1.      All records relating to violations of  18 U.S.C. § 922(g)(1) (felon in possession of a firearm or ammunition); 18 U.S.C. § 1623(a) (perjury); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. §§  371 and 1503 (conspiracy to commit obstruction of justice); 18 U.S.C. § 1512(b)(2) (witness tampering); 18 U.S.C. § 1512(c)(2) (witness tampering); and 18 U.S.C. § 1512(k) (conspiracy to commit witness tampering), those violations involving Darias JACKSON, Jessica BROWN, Gregory JACKSON, Jearid IRVIN, and other conspirators and occurring on or about September 19, 2019, through the present, including:

a.   All communications and records, in whatever form they may be—whether they are paper communications such as letters, audio recordings, electronic communications, or otherwise:

i.   that contain evidence of Darias JACKSON, Jessica BROWN, Gregory JACKSON, and/or Jearid IRVIN endeavoring to influence, obstruct, evade, impede, or otherwise interfere with the investigation into Darias JACKSON's role in the shooting of A.W. on September 19, 2019;

ii.   that contain evidence of Darias JACKSON, Jessica BROWN, Gregory JACKSON, and/or Jearid IRVIN engaged in a conspiracy to pay, influence, persuade, bribe, threaten, or otherwise communicate with A.W. for the purpose of getting A.W. to recant his identification of JACKSON

as the person who shot him on September 19, 2019, or to otherwise not

cooperate in criminal prosecutions and investigations;

iii. relating to the shooting of A.W. on or about September 19, 2019, near

Groesbeck Road in Cincinnati, Ohio, including any communications

relating to the incident;

iv. relating to the possession of a firearm and ammunition by Darias

JACKSON;

v. relating to communications between A.W. and Darias JACKSON,

including, but not limited to, communications related to the September

19, 2019 shooting of A.W., and communications related to obstructing,

impeding, interfering, or influencing the investigation and judicial

proceedings regarding Darias JACKSON's role in the shooting of A.W.

and possessing firearms and/or ammunition;

vi. relating to communications between A.W. and Jearid IRVIN, including,

but not limited to, communications related to the September 19, 2019

shooting of A.W., and communications related to obstructing, impeding,

interfering, or influencing the investigation and judicial proceedings

regarding Darias JACKSON's role in the shooting of A.W. and possessing

firearms and/or ammunition;

vii. relating to communications between A.W. and Gregory JACKSON,

including, but not limited to, communications related to the September

2

19, 2019 shooting of A.W., and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A.W. and possessing firearms and/or ammunition;

viii. relating to communications between A.W. and Jessica BROWN, including, but not limited to, communications related to the September 19, 2019 shooting of A.W., and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A.W. and possessing firearms and/or ammunition;

ix. relating to communications to or from A.W. and other third parties related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A.W. and possessing firearms and/or ammunition;

x. regarding money used to facilitate a payoff to A.W.;

2. Any and all firearms or ammunition potentially used in or related to the commission of the shooting of A.W. on September 19, 2019.

3. U.S. currency ($1,000.00 or more) that could form the second half of the payoff still owed to A.W. in exchange for A.W.'s recantation.

4. For any computer or storage medium, including any cell phones and tablets, whose seizure is otherwise authorized by this warrant, and any computer or storage medium that

3

contains or in which is stored records or information that is otherwise called for by this warrant
(hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the
    things described in this warrant were created, edited, or deleted, such as logs,
    registry entries, configuration files, saved usernames and passwords, documents,
    browsing history, user profiles, email, email contacts, "chat," instant messaging
    logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as
    viruses, Trojan horses, and other forms of malicious software, as well as evidence
    of the presence or absence of security software designed to detect malicious
    software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to
    determine the chronological context of computer access, use, and events relating
    to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime
    under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar
    containers for electronic evidence;

4

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

**IN THE MATTER OF THE SEARCH OF:**
**3501 MEADOW AVENUE, CINCINNATI,**
**OHIO 45211**

**Case No.**  1:21-mj-176

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Edward Schaub, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 3501 Meadow Avenue, Cincinnati, Ohio, 45211, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I have been employed with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as a Special Agent since September of 2014 and am currently assigned to the ATF Organized Crime Squad.  I am a graduate of the Criminal Investigator Training Program and Special Agent Basic Training in Glynco, Georgia.  Prior to becoming a Special Agent, I was a Hopkinsville Kentucky Police Officer for eight years and was an ATF Task Force Officer assigned to the Western Kentucky Gun Crimes Task Force in Christian County, Kentucky. I am a graduate of the Department of Criminal Justice Training Center in Richmond, Kentucky. During my employment with ATF, I have been involved in numerous investigations of violations

of federal and state criminal laws resulting in multiple successful prosecutions. My

investigations have included analysis of evidence retrieved from computers, cell phones, and

other electronic devices.

3.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

A.      **ATF and the U.S. Attorney's Office are investigating a shooting that occurred in September 2019, as well as attempts to obstruct that investigation by Jessica BROWN, Jearid IRVIN, Gregory JACKSON, and others.**

4.      As I describe in more detail below, ATF and the U.S. Attorney's Office for the

Southern District of Ohio are investigating a shooting that occurred in the early morning hours of

September 19, 2019. Based on the investigation to date, I believe that Darias JACKSON

("JACKSON") was the shooter. I also believe that, after the shooting, JACKSON and his

girlfriend, Jessica BROWN, and JACKSON's brothers Gregory JACKSON ("G. JACKSON")

and Jearid IRVIN, along with other unknown individuals, conspired to obstruct the government's

investigation into the shooting, including by conspiring to pay the shooting victim (the "Victim")

to recant his identification of JACKSON as the shooter. I believe that G. JACKSON and IRVIN

helped obtain the Victim's recantation by bringing a typewritten affidavit to the Victim's

hospital room, which was part of the plot to thwart the criminal prosecution against JACKSON. I

2

further believe IRVIN and his coconspirators' attempts to obstruct the government's investigation are ongoing.

**B.      On September 19, 2019, the Victim was shot several times in the parking lot outside an apartment on Groesbeck Road in Cincinnati.**

5.      At approximately 3:09 am on September 19, 2019, a 911 caller reported that a victim (later identified as A.W.) had been shot near an address on Groesbeck Road in Cincinnati, Ohio.  While officers were on their way, they received reports that someone had recently arrived at the hospital suffering from multiple gunshot wounds.

6.      Officers located nine 9 mm casings and blood in the parking lot in front of the apartment on Groesbeck Road.  The ammunition associated with these casings was manufactured outside the State of Ohio. Officers never located the firearm used to shoot the victim.

7.      Shortly after his/her arrival at the hospital, the Victim was taken into surgery and was unable to provide any statements to officers for several days.

**C.      On October 2, 2019, the Victim identified JACKSON as the shooter.**

8.      On October 2, 2019, when shown a 6-pack of photographs, the Victim identified Darias JACKSON as the shooter and said he/she had known JACKSON for many years.

9.      At the time of the shooting on September 19, 2019, JACKSON was on federal supervised release in connection with his 2013 conviction for Conspiracy to Possess with Intent to Distribute 1,000 Kilograms or More of Marijuana in violation of 21 U.S.C. §§ 846

3

and 841(a)(1) and (b)(1)(A), a Class A felony punishable by more than one year in prison. JACKSON was sentenced to 50 months' imprisonment for that offense.

>    **D.    On October 31, 2019, two men, including JACKSON's brother JEARID IRVIN, brought a typewritten affidavit to the Victim in which the Victim recanted his previous identification of JACKSON as the shooter.**

10.    On October 31, 2019, a notary public for the hospital where the Victim was being treated was called to the Victim's room to notarize a statement in which he/she recanted his/her identification of JACKSON as the shooter.

11.    Upon entering, the notary saw six people in the room: the Victim, who was sitting in his/her bed with his/her legs dangling over the side; three individuals on a love seat who the notary believed were likely the Victim's parents and a sibling; and two males whom she did not now in the back of the room. The notary stated that the two men in the back of the room brought the typewritten affidavit to her. The Victim told the notary that he/she had read the affidavit. The notary then asked three questions to determine whether the Victim was competent to sign the affidavit ("Who is the president of the United States?" "Where are you?" and "What is today's date?"). After receiving satisfactory responses, the notary reviewed the affidavit with the Victim and noted to him/her that it appeared the Victim was recanting a previous statement. The Victim responded that he/she was recanting because the person the Victim had accused was the Victim's cousin and it was the first name he/she had thought of after the shooting and that was why he/she said the name originally. According to the notary, the Victim stated, "He's my boy; it was not him." When one of the individuals the notary believed were the Victim's parents

4

asked what the Victim was signing, the Victim responded that it was just paperwork for the hospital.

12.     The Victim signed the affidavit, and the notary notarized it.  As soon as the document was notarized, the two men in the back of the room stepped forward, took the signed statement, and walked out of the room.

13.     Later, as the investigation into the shooting and subsequent obstruction continued, law enforcement learned from a confidential witness, CW-1,[1] that the Victim had told him/her that one of the two men who provided the affidavit to the Victim in the hospital was JACKSON's brother Jearid IRVIN. CW-1 was not sure who the second man was; however, based on the evidence I describe below, I believe the second individual was likely JACKSON's brother G. JACKSON.

**E.     On January 8, 2020, the Victim reaffirmed that JACKSON was the shooter.**

14.     In a telephone interview on January 8, 2020, the Victim again identified JACKSON as the shooter, saying that he/she had been on a substantial amount of pain medicine when he/she signed the affidavit on October 31, 2019.

---

[1] CW-1 was convicted of drug trafficking once in the mid-1990s and again in the early 2010s. Apart from these felony convictions, CW-1 has a couple of misdemeanor convictions that are more than a decade old. None of his/her criminal history involves crimes of dishonesty.

**F.    A video taken moments before the shooting appears to show the Victim and JACKSON in an aggressive verbal confrontation.**

15.    After the shooting, but before the Victim was medically stable and could be interviewed, law enforcement received anonymous tips that someone had taken video of a confrontation between the Victim and JACKSON shortly before the shooting.

16.    Law enforcement later obtained a copy of the video, which shows two individuals who strongly resemble the Victim and JACKSON in an aggressive verbal confrontation.  The two individuals appear to be standing in the parking lot outside the Island Breeze Apartments on Groesbeck Road, near where the Victim was shot.

17.    The video's metadata show that the video was taken at 3:06 am—approximately three minutes before the 911 call reporting that the Victim had been shot.  The video also partially shows a vehicle that is consistent in appearance with a vehicle registered to JACKSON; the person who appears to be JACKSON is sitting on that vehicle in parts of the video.  Because the video appears to have been taken from inside an apartment, while the two individuals were outside in the parking lot, the individuals' words cannot be clearly heard.

**G.    Jail calls revealed that JACKSON instructed BROWN to testify falsely when BROWN was subpoenaed to testify before the grand jury.**

18.    On July 7, 2020, I called JACKSON's girlfriend, BROWN, and left a message asking her to call me back so that I could arrange to serve her with a subpoena for her testimony at a federal grand jury proceeding.

6

19.     That afternoon, before BROWN returned my call, BROWN first spoke to JACKSON on a recorded jail call that JACKSON placed to BROWN's personal cell phone ending in 5859 (the "5859 Phone"). In this call, JACKSON instructed BROWN to call me (Agent Schaub) back "right now" and said that she did not need to comply with a subpoena. They arranged for JACKSON to call JACKSON's personal cell phone ending in 5587 (the "5587 Phone"), which was in BROWN's possession, so that BROWN would be on the phone with JACKSON and me simultaneously, but using two different cell phones. In other words, BROWN had both her personal phone, the 5859 Phone, and JACKSON's personal phone, the 5587 Phone, at the time she returned my call. BROWN used her personal phone to return my call, but first arranged for JACKSON to call the 5587 Phone so she would be on the phone with JACKSON for the entirety of her call with me.

20.     Jail call records reflect that after calling BROWN on the 5859 Phone (i.e., after the call on which they discussed the plan for BROWN to call me back), JACKSON hung up and immediately called the 5887 Phone (which, again, was in BROWN's possession) as planned. While BROWN was speaking to JACKSON using the 5887 Phone, BROWN simultaneously called me from her phone, the 5859 Phone. I believe BROWN placed my call with her on speakerphone so that JACKSON could hear what we were saying because in the recorded audio from the 5587 Phone call I can hear my voice as I am speaking to BROWN.

21.     JACKSON and BROWN spoke several times in the twenty-four hours immediately preceding her grand jury testimony, which occurred on July 8, 2020. Over the

7

course of these phone calls JACKSON made numerous statements instructing BROWN not to comply with the subpoena, including telling her what answers to give to the prosecutors conducting the questioning and telling her to withhold information.  BROWN acknowledged JACKSON's instructions and agreed with his proposal.

22.     Within hours of BROWN's grand jury testimony, an inmate at the jail called her "for DJ" to "make sure you are alright" and to see "how did everything go."  BROWN indicated that everything was fine. Later that night, when she and JACKSON spoke on the phone in another recorded jail call, she repeated the questions asked of her and told JACKSON what her answers were. She said that she did not have to "plead the Fifth" because "they were asking stupid [expletive]" and nothing about the questioning stood out apart from a question about a telephone call she made to JACKSON the night of the shooting.

23.     I know, based on my review of dozens of recorded jail calls between JACKSON and BROWN, that JACKSON and BROWN frequently discuss the pending investigation and prosecution against JACKSON. I also know, based on my review of dozens of recorded jail calls between JACKSON and BROWN, that JACKSON has instructed BROWN to place various phone calls to other individuals using his cell phones, and BROWN has complied. I also know that they often speak in ways that are consistent with purposefully vague and coded language designed to thwart law enforcement from being alerted to their true topic of conversation. For example, I know in one recorded jail call from October 2019, in which JACKSON called BROWN on BROWN's personal phone, JACKSON instructed BROWN to use one of his cell

8

phones to place a call to a third party. BROWN placed the call using JACKSON's cell phone and no one answered, but shortly thereafter BROWN received a call back on JACKSON's cell phone from that third party. After BROWN answered and then ended the call she had just received on JACKSON's cell phone, JACKSON asked her, "You know what he's talking about, don't you?" BROWN responded, "Yeah, I got you." Some of this portion of their exchange is unintelligible, but BROWN appeared to reassure JACKSON that she had "repeated" JACKSON's statements to the caller. Then JACKSON told BROWN that "the DVDs" are "three dollars" each, "you know what I mean?" But if someone wants to "rent DVDs," that's "two dollars a day," or "at least a dollar ninety cent, you know what I mean?" JACKSON verified that BROWN had "heard" him, and BROWN responded in the affirmative. Jackson repeated the pricing he had just described, then continued, "But if he's trying to buy the whole DVD with all the episodes on it, he can just give you—he can just give you three dollars." JACKSON repeated this pricing information several times and got confirmation that BROWN understood. Based on my training and experience, and my knowledge of JACKSON and the investigation thus far, I do not believe that DVDs are the true subject of their conversation. Therefore, I believe that JACKSON and BROWN are cognizant of the fact that these calls are monitored and make efforts to disguise their meaning.

24.     Based on my training and experience, and based on my review of JACKSON's recorded jail calls and my meetings with BROWN, I believe that JACKSON instructed BROWN not to testify fully and completely in order to frustrate the grand jury's investigation. I also

believe that JACKSON and BROWN are aware that their jail calls are recorded and speak in coded language during those calls.

**H. A search warrant for two phones seized from BROWN in October 2020 revealed evidence of a scheme in which G. JACKSON paid the Victim to recant his identification of JACKSON.**

25.     In October 2020, BROWN was arrested. Incident to her arrest, agents located two Apple iPhones. On October 28, 2020, in Case No. 1:20-MJ-00779, the Honorable Karen Litkovitz, U.S. Magistrate Judge, signed a search warrant authorizing the search of these two phones.

26.     One of the two Apple iPhones is BROWN's personal cell phone, with call number ending in 5895. My review of the forensic analysis of this phone revealed multiple text messages between BROWN and an individual using phone number 513-858-5005. I believe that the individual using the 513-835-5005 phone is the Victim, because the contact is listed in BROWN's phone as "[Victim's nickname] {for DJ}", and because the content of the messages leads me to believe that the two are discussing a scheme in which JACKSON and a coconspirator paid the Victim to recant his statement incriminating JACKSON. For example, the following are text messages exchanged between BROWN and the Victim on October 10, 2020:

| | |
|---|---|
| **Victim:** | Cuz when my cousin call tomorrow tell him I was suppose to meet with bruh n den meet that lady but bruh switched up wat he saying or sum [unidentified emoji] tell em it ain't nun doe |
| **BROWN:** | Switched up what? |

10

**Victim:** Just a misunderstanding about everything I guess I'll call g later n see what's up ….. but look doe I sent bruh dis [Attachment below]



| | |
|---|---|
| **Victim:** | Like bruh I already did wat I was suppose to hit his charges dismissed regardless of who ever else said different I said thst n he beat that case this fed shit is new to me … but I still a look out for bruh befor he be doing a zillion years or a accident ….. but not if a mf tryna play me again Jessica it don't make sense when. I can just be silent like I've been this whole time that [JACKSON's defense attorney][2] lady said that would help him doe a lot. |
| **Victim:** | G told me I'll get str8 once I walk n the courtroom like that shit just sound like some perpin shit but the funny par is im willing to speak on cuz behalf |
| **Victim:** | I'll go speak on his behalf on the strength fucc the money I thought bruh was looking out on the strength of his mistake Jessica I'm fucced up surgeries n shit allat …. N fr dat was my mf brother bruh like this nothing never pose to cane between us I know that nugga heart man he salt asf 2 tell em I still love em tf |
| **BROWN:** | Ima call you n a min |

27. I believe, based on my training and experience, and my knowledge of the investigation to date, that in the above text messages, when the Victim said, "I already did wat I was suppose to hit his charges dismissed," he meant that he had helped get JACKSON's state charges dismissed by signing an affidavit recanting his identification of JACKSON as the shooter and then failing to appear to trial.

---

[2] As described in more detail below, the Victim uses a misspelling of the first name of one of JACKSON's defense attorneys of record. Based on other text messages and voicemails left by this defense attorney on BROWN's phone, as well as other communications between BROWN and the Victim, the context leads me to believe that the Victim is referring to JACKSON's defense attorney, and not another individual with the same first name.

28.     I also believe that the attachment the Victim sent to BROWN, depicted above, is a screenshot of an iPhone conversation between the Victim and G. JACKSON, JACKSON's brother. The contact is identified as "Greg Jizzle"; "Greg" is G. JACKSON's first name, and "Jizzle" is a nickname for JACKSON.[3] I believe that the Victim sent this screenshot of his conversation with G. JACKSON to BROWN to demonstrate that the Victim was owed money in exchange for not cooperating in the prosecution against JACKSON. The Victim also included a photograph of the state court charges against JACKSON for the September 19, 2019 shooting to further underscore that the payoff was in reference to getting JACKSON's charges dismissed.

29.     I also believe that, when the Victim said, "I can just be silent like I've been this whole time[.] [T]hat [JACKSON's defense attorney] lady said that would help him doe a lot," he meant that one of JACKSON's attorneys of record had told him—or at least he had understood from the conversation—that remaining silent would help JACKSON. I believe that the person he references, whose name I have redacted in this affidavit, is one of JACKSON's attorneys of record, because (1) the redacted name is a misspelling of the first name of one of JACKSON's attorneys; and (2) my review of BROWN's phone also revealed multiple text messages and voicemails from this attorney in which the attorney repeatedly asks BROWN to facilitate a meeting between JACKSON's lawyers and the Victim. I also reviewed other text messages

---

[3] The alias "Jizzle" is included in a 2013 federal indictment against Darias JACKSON.

between BROWN and the Victim about the Victim meeting with defense counsel. In one

message to BROWN, the Victim says he spoke to the attorney I referenced above.

30.     The Victim and BROWN also communicated via text message on October 20,

2020. These messages include the following exchange:

> **Victim:**          G ask how much I told em 8 jizzle already gave me 7 last year … I
> guess he ain't tryna do that for bruh or it just everything n me
> telling me like cuz tryna spend u like last time … I don't get it
>
> **BROWN:**          Sheesh I ain't know anything about 8
>
> **Victim:**          7 plus 8 that's 15 cuz coulda gave me close to that doe I'm tryna
> get my living shit together
>
> **Victim:**          It was 15 from jump doe
>
> **Victim:**          Half now half later was da agreement
>
> **Victim:**          Brought me 7 said it was 7500 but it was 7

31.     As noted above, I know from prior investigations of JACKSON that "Jizzle" is

one of his nicknames. I believe, based on my training and experience and my knowledge of the

investigation to date, that in the above text messages the Victim was describing being paid

money by JACKSON in exchange for helping JACKSON evade criminal prosecution.

Specifically, when the Victim said, "G ask how much I told em 8 jizzle already gave me 7 last

year," and then "7 plus 8 that's 15 cuz coulda gave me close to dat doe," I believe he meant that

the agreement was for $15,000.00, with half paid to the Victim up front and half later. I believe

that the Victim was telling BROWN that he was still owed $8,000.00, which reflects that "jizzle"

14

(JACKSON) had already paid the Victim $7,000.00. I further believe (based on the screenshot above, showing the conversation with "Greg Jizzle") that "G" is a reference to G. JACKSON, and that in the above exchange the VICTIM was explaining to BROWN that the Victim had been in touch with G. JACKSON regarding the $8,000.00 the Victim was still owed.

32.     I also believe that, when the Victim said, "Just a misunderstanding about everything I guess I'll call g later n see what's up," he meant that he would call a third party—whom he referred to as "g"—about the scheme to pay the Victim to recant his identification of JACKSON. As explained above, I believe "g" refers to G. JACKSON.

33.     In another message, the Victim exchanged the following texts with BROWN:

**Victim:**          Wasup with cuz u talk to him … got surgery coming up

**Victim:**          Is they gone let him out

**BROWN:**          Waiting on him to call. When is your surgery?

**BROWN:**          Idk if they letting him out they waiting to hear from you I guess

**Victim:**          Yea they should let him out for usre after I talk to her my surgery n 2 weeks….

**Victim:**          Why they ain't let him out when I sign that paper n got his charges dismissed

                     [. . . .]

**BROWN:**          Feds picked up the case, on the other end it's all good

**Victim:**          Ok Shiid can we do that the same day we go see that lady u can take me or wateva or meet me or she a come to us at dee dee hz

15

34.     Based on my training and experience and knowledge of this case, including the context of these messages, I believe that when the Victim said, "can we do that the same day we go see that lady," he was referring to a joint meeting between the Victim, BROWN, and JACKSON's attorney of record. I further believe that when the Victim said, "u can take me or wateva or meet me or she a come to us," he meant that BROWN could take him to the meeting with JACKSON's counsel.

I.     **The search of BROWN's personal cell phone seized in October 2020 also revealed evidence that, contrary to her representations, BROWN had communicated with IRVIN by cell phone and on Facebook.**

35.     I know that in July 2020 BROWN represented to law enforcement that she was unfamiliar with JACKSON's family. Specifically, when asked if she knew who JACKSON's brothers were, she said she only knew that he had three. After additional questioning, BROWN admitted she knew that one of JACKSON's brothers is named "Greg," but she claimed not to know the names of his other two brothers. BROWN also said she did not know whether JACKSON's brothers lived in Cincinnati, Ohio, and that she had only ever met Greg once.

36.     My review of the cell phone seized from BROWN in October 2020 leads me to believe that BROWN was lying and that, in fact, she knows IRVIN and G. JACKSON well, that she communicates with them frequently, and that she was in contact with them shortly before her phone was seized in October 2020.

37.     First, the phone number 513-953-5123 is saved under "Jearid" in BROWN's phone. "Jearid" is the first name of one of JACKSON's brothers, Jearid IRVIN. The text

16

message chain with "Jearid" starts in February 2020—months before BROWN told law enforcement that she did not know IRVIN. In text messages from May 2020, BROWN refers to "Jearid" as a "brother," which is consistent with the relationship between BROWN and JACKSON, which would make "Jearid" akin to a brother-in-law. (As stated above, BROWN and JACKSON have been dating since they were in high school, and the oldest of their three children is approximately ten years old.) Additionally, "Jearid," refers to BROWN as "sis" in text messages from May 2020.

38.     Another text chain on BROWN's phone is with the contact "Greg (Bra)." This text chain starts in January 2020. In a text from October 2020, "Greg (Bra)" sent BROWN a text with a screenshot of an "Official Record of Benefit Payment History" for JACKSON; this screenshot includes the last four digits of JACKSON's Social Security number. In texts from June 2020, BROWN refers to "Greg (Bra)" as a "brother," which I believe is further evidence that the numbers in BROWN's phone under the contacts "Jearid" and "Greg (bra)" are indeed JACKSON's brothers IRVIN and G. JACKSON, respectively.

39.     I also reviewed text messages between BROWN and a contact labeled "My Son," who I believe is her eldest child.[4] In one text message from September 6, 2020, BROWN asks

---

[4] The contact in BROWN's phone labeled "My Son" is under a phone number I know is registered to JACKSON. To protect the child's privacy, I am not including any other identifying information in this search warrant application.

where her son is, and the son responds, "Uncle Jearid"; I interpret this to mean that the son was with IRVIN, possibly at his house. In another text from August 8, 2020, BROWN's son asks, "Can I stay here with my uncle Greg[?]." These text messages are further evidence that BROWN was in contact with both IRVIN and G. JACKSON shortly before her phones were seized in October 2020.

40.     BROWN's phone also contained evidence that she communicates with IRVIN via Facebook.[5] I know, based on my training and experience, that modern cell phones allow users to access their Facebook accounts on their phones. BROWN's cell phone records reflect that BROWN has a Facebook account with Facebook ID 100000707406513. BROWN has two Facebook friends named "Jearid Irvin" with username "jearidirvin." One "Jearid Irvin" Facebook friend has Facebook ID 100044629386214, and the other has Facebook ID 100032754637943. I believe the "Jearid Irvin" account with Facebook ID 100044629386214, depicted below, belongs to JACKSON's brother IRVIN:

---

[5] As I describe below, I found additional evidence of BROWN's Facebook communications with IRVIN in the results of a search warrant for BROWN's Facebook account. U.S. Magistrate Judge Stephanie K. Bowman signed a search warrant for the contents of BROWN's Facebook account on January 13, 2021, in case number 1:21-MJ-019.

| 3188 | Name: Jearid Irvin<br>Interaction Statuses:<br>Friend<br>Source: Facebook<br>Messenger<br>Account:<br>100000707406513<br>Photos: | | User ID:<br>Facebook Id 100044629386214<br>Username jearidirvin |
|---|---|---|---|

41.     I believe the Facebook ID 100044629386214 belongs to IRVIN based on the content of the messages and posts exchanged between BROWN and Facebook ID 100044629386214, as discussed in more detail below. The other "Jearid Irvin" account, with Facebook ID 100032754637943, may or may not belong to IRVIN.[6] The source for both "Jearid Irvin" friends in BROWN's phone is listed as "Facebook Messenger," which is a messaging application on the Facebook platform that allows friends to send each other private messages. As I describe in more detail below, BROWN's Facebook records reflect that BROWN communicated with IRVIN on the platform, such as by commenting on each other's posts.

42.     Facebook records show that BROWN became "friends" with Facebook ID 100044629386214 on December 11, 2019.

---

[6] IRVIN has an adult son with the same name. Due to a lack of data in the forensic analysis of BROWN's phone and Facebook account regarding Facebook ID 100032754637943, I cannot at this time tell whether this is a second Facebook account that belongs to IRVIN or if it belongs to his son.

19

43.     Eight days later, on December 19, 2019, JACKSON's defense attorney of record in the state case filed a "Motion to Dismiss/Supplemental Motion to Suppress Identification" with the Victim's recantation attached as an exhibit.

HAMILTON COUNTY COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

CLERK OF COURTS
HAMILTON COUNTY, OH
COMMON PLEAS

**2019 DEC 19 A 11: 04**

STATE OF OHIO,                                          :          CASE NO. B1905606

         Plaintiff                                          :          JUDGE PATRICK FOLEY
vs.                                                              :
                                                                      :          MOTION TO DISMISS/
DARIAS JACKSON,                                     :          SUPPLEMENTAL MOTION TO
                                                                      :          SUPPRESS IDENTIFICATION
         Defendant                                        :

**FILED**

Defendant, by and through the undersigned counsel, hereby supplements its previously

filed Motion to Suppress Identification with unequivocal, compelling proof that the victim's

purported identification of the victim as the person that shot and injured him was the result of a

unduly and unnecessarily suggestive procedure. The identification of the Defendant by the

alleged victim was unreliable under all circumstances. With respect to the identification of the

Defendant, the victim in this case, Antonio Williams, testified under oath that:

> 1.    At the time he identified Darias Jackson as the person
>        who shot him he was under the influence of narcotic
>        pain medication and was not thinking clearly.
>
> 2.    He mistakenly identified Darias Jackson as his shooter.
>
> 3.    The reason he thought it could have been Darias Jackson
>        was because he was in an argument with Darias Jackson earlier at
>        a bar and he assumed that it was Darias Jackson who shot
>        him.
>
> 4.    He is not sure who shot him.
>
> 5.    He does not believe that Darias Jackson was in fact the
>        person that shot him.
>
> 6.    It was suggested to him by various people that it may
>        have been Darias Jackson and that it is why he identified
>        Darias Jackson as the person who shot him.



D127539857

See Affidavit of Antonio Williams attached hereto as an Exhibit .

21

44.     As described above, CW-1 told law enforcement that the Victim had said that IRVIN was one of the two men who brought the affidavit to the Victim in the Victim's hospital room.

45.     Based on my training and my experience investigating conspiracies, I believe IRVIN and his coconspirators needed to communicate about the plan, including about how to get the affidavit to JACKSON's defense attorney, and that it is therefore possible that IRVIN and BROWN became "friends" during this time frame because of their need to communicate regarding the scheme.

46.     BROWN's Facebook records also reflect that BROWN and IRVIN, using Facebook ID 100044629386214, commented on each other's Facebook posts after becoming "friends" in December 2019, such as in the post pictured below:

**User** Jearid Irvin (100044629386214)
**Text** Hbd Newphew Jr be there bout 5 turn up□□□□□□♥
**Time** 2020-04-13 19:01:47 UTC

47.     I believe that the above comment, posted on April 13, 2020, was in response to BROWN's post about her son's birthday, who is IRVIN's nephew. I further believe that when IRVIN said "be there bout 5" IRVIN meant that he would meet BROWN and her son in five minutes.

48.     In another exchange between BROWN and Facebook ID 100044629386214 in April 2020, BROWN refers to the user of Facebook ID 100044629386214 as "brother," as depicted below:

| | |
|---|---|
| **Time** | 2020-04-29 16:42:52 UTC |
| **Type** | Comments |
| **Summary** | Jessica Optimistic Brown replied to a comment on a post from April 29, 2020. |
| | `@[100044629386214:2048:Jearid Irvin] thanks brother love you too ❤❤` |
| **Object Id** | S:_l100000707406513:707404410038244:15 |

I

49.     I believe the above two Facebook posts show that the user of Facebook ID 100044629386214 is IRVIN, and that BROWN was lying in July 2020 when she told law enforcement that she did not know IRVIN.

50.     Additionally, my review of BROWN's Facebook account revealed that she had attempted to "friend" the Victim (or at least an account under the Victim's name) on May 12, 2020, but that he refused her request, as the partially redacted picture below shows: [7]

---

[7] This portion is redacted because it reflects the Victim's full legal name. I believe the string of numbers following his name is the Victim's Facebook ID.

|  |  |
|---|---|
| **Sender** | Jessica Optimistic Brown (100000707406513) |
| **Recipient** | ▬▬▬▬▬▬ (100029478531158) |
| **Marked As Spam** | false |
| **Hidden** | false |
| **Rejected** | true |
| **Accepted** | false |
| **Time** | 2020-05-12 22:42:01 UTC |

51.     Because G. JACKSON has been in communication with the Victim about paying the Victim off, as demonstrated by the screenshot and text conversations discussed in a previous section above, and because I believe that IRVIN procured the affidavit from the Victim in exchange for the payoff, I believe that IRVIN'S cell phone, along with any other electronic storage medium IRVIN possesses, may also contain messages in which IRVIN discusses the criminal prosecution against JACKSON with the Victim, G. JACKSON, BROWN, and/or third parties as part of a scheme to help JACKSON evade criminal liability. I know that, in July 2020, BROWN falsely represented to law enforcement that she did not have a Facebook account. I believe that BROWN was purposefully attempting to keep law enforcement from scrutinizing IRVIN in connection with the investigation into the September 19, 2019 shooting. I further believe that she tried to hide the existence of her Facebook account because it may contain evidence that she conspired with G. JACKSON, IRVIN, and/or others to pay off the Victim in exchange for the Victim's recantation, and/or because Facebook records would show connections amongst the coconspirators.

24

**J.   Jail calls from October 2019 through November 2019 recorded JACKSON communicating with G. JACKSON, IRVIN, and BROWN about the plot to pay the Victim money in exchange for the Victim signing the affidavit recanting the Victim's identification of JACKSON as the shooter.**

52.    JACKSON has been in custody since October 4, 2019, and throughout his incarceration he has made hundreds of jail calls using his assigned inmate PIN. However, a review of BROWN's cell phone records revealed that BROWN received multiple phone calls from the jail in October and November 2019 that were not recorded under JACKSON's pin. My review of jail records revealed that JACKSON used at least five other inmates' PINs to speak to BROWN, G. JACKSON, IRVIN, and JACKSON's mother.[8] These calls, which are excerpted below, were recorded. I believe JACKSON placed these calls using other inmates' PINs so that he could speak more freely with his co-conspirators, believing that these calls would not come to investigators' attention. These calls contain additional evidence of the plot to thwart the criminal prosecution of JACKSON.

53.    In one call JACKSON placed three days before the affidavit was signed, I believe JACKSON and BROWN discussed JACKSON's brothers G. JACKSON (GREG) and IRVIN obtaining the Victim's affidavit from JACKSON's defense attorney's[9] office:[10]

---

[8] I believe that the phone number 513-481-1960 belongs to JACKSON's mom, and that is a landline phone number. This number is saved in BROWN's phone as "Dj hz," which I believe stands for "DJ's House." A woman JACKSON calls "mom" answers the phone when JACKSON calls this number in the recorded jail calls.

[9] The conspirators used an abbreviation of JACKSON's defense attorney's name, by which the defense attorney was also known professionally.

[10] The transcriptions of these jail calls are not precisely verbatim, but capture the essential substance of the calls.

| Date | Dialed # | Content |
|---|---|---|
| 10/28/19 at 11:14 a.m. | 513-212-5895 (BROWN) | **BROWN:** Your brother says [U/I] have questions [U/I] |
| | | **JACKSON:** You seen my brother? |
| | | **BROWN:** Uh huh. |
| | | **JACKSON:** Where you was at, my mama's house? |
| | | **BROWN:** Uh huh. |
| | | **JACKSON:** Aight. I wish I woulda caught it [U/I] . . . Did he tell you anything? |
| | | **BROWN:** He was waiting on her. |
| | | **JACKSON:** Who, [JACKSON's defense attorney]? |
| | | **BROWN:** Mm hmm. |
| | | **JACKSON:** I mean, what you mean by that, though? I thought they said it was going to be there at the front desk. |
| | | **BROWN:** Shit, I don't know. I guess she [U/I] help typing it up. I don't know. [U/I] Greg [U/I] talking to Greg. [U/I] |
| | | . . . . |
| | | **JACKSON:** Gonna call my brother, though, probably about 2. |
| | | **BROWN:** I haven't talked to Greg yet. |
| | | **JACKSON:** Huh? |
| | | **BROWN:** I said I haven't talked to Greg yet. |
| | | **JACKSON:** Ain't that who you said was at the house? |
| | | **BROWN:** No, I said Jearid. That's what I said. Um when you asked me, I said I hadn't talked to Greg. [U/I] easier to talk to. |
| | | **JACKSON:** Yeah, that's what I'm saying. You should have told him, why he waiting on her and the paper on her desk already? It's waiting on him. |

**BROWN:** Yeah, so she already knew he was going up there. He said I know that part.

**JACKSON:** Yeah, see, mothafuckas is movin' on their own time. Would you tell my brother to call him and go get that paper?

**BROWN:** Yeah.

**JACKSON:** What the fuck. Mothafuckers procrastinating. That shoulda been first priority, man. After the kids get to school and all that, that shoulda been first priority.

**BROWN:** Mm hm.

**JACKSON:** Especially when -- how one motherfucker know they supposed to be going this way, other one knows they supposed to be going this way, when y'all gonna meet in the middle and get it done?

**BROWN:** Right.

**JACKSON:** That's what I be saying, man. He telling he waiting on [JACKSON's defense attorney]. When [JACKSON's defense attorney] already done told my brother that the paper at her desk.

**BROWN:** Lack of communication.

**JACKSON:** Yeah, that's what I'm saying, though. But you knew that too, though. You shoulda been like why are you waiting on her? The paper there, waiting on you.

**BROWN:** Right, I'm just like, um, I know for a fact he's doing nothing. He's like yeah [U/I] I don't know. I'm a call Greg. Greg already [U/I] talked to [U/I]

**JACKSON:** You said what?

**BROWN:** Greg done probably already talked to her and everything.

**JACKSON:** See you ain't hearing nothing I been saying. That's what I be saying about comprehension. What is there to talk about? When she talked to him on the 25th –

27

| | | |
|---|---|---|
| | | **BROWN:** Ok, I'ma call Greg.<br><br>**JACKSON:** No, I'm saying, when she talked to him on the 25th, when [JACKSON's defense attorney] got on the phone, she said the paper would be available to pick up at her office Monday morning.<br><br>**BROWN**: OK. So he shoulda picked it up to have it signed already.<br><br>**JACKSON:** Meaning, yeah, somebody should have picked it up. Not talked to her again on Monday to see what's going on. Mothafuckers talked to her last week to know what's going on. [ . . . ] Tell him I said I'll call him about 1:30 or something. |

54.    Later that day, JACKSON and BROWN spoke again.[11] I believe, based on the context of other calls discussed below, that on this call JACKSON told BROWN to meet with GREG so that the two could coordinate getting money for the payoff to the Victim:

| Date | Dialed  # | Content |
|---|---|---|
| 10/28/19<br><br>4:04<br>p.m. | 513-212-5895<br><br>(BROWN) | **JACKSON:** Get with my brother… get with my brother and give him something… I guess he'll tell you what it is… but give him something, and uh…<br><br>**BROWN:** Yeah he has [U/I]<br><br>**JACKSON:** I just, I just told him, uh… I just told him, uh… I just told him, what, what to get, what to uh, what to get from you, so, just call him, and uh, give it to him, but you remember what you, remember what you came… uh…. showed me…<br><br>. . . . |

---

[11] This particular call was placed under JACKSON's assigned PIN.

| | | |
|---|---|---|
| | | **JACKSON:** All right, well call my brother and see what he talking about… and give it to him |
| | | **BROWN**: I'm already [U/I]… we about to run downtown so that's the first thing [U/I] |

55. Two days later, JACKSON called his mother using another inmate's PIN, and after about six minutes, his mother said, "Here your brother. Here, Greg." A man I believe is JACKSON's brother G. JACKSON then got on the phone, and the two appeared to discuss the scheme to get the affidavit and to pay off the Victim. A third male, who I believe based on context is IRVIN, called G. JACKSON (GREG) on speaker phone during the call, and the three then discussed how IRVIN was going to pick up the affidavit from JACKSON's defense attorney's office at 11 a.m.:

| Date | Dialed # | Content |
|---|---|---|
| 10/30/19<br><br>10:31 a.m. | 513-481-1960<br><br>(JACKSON'S mom) | **GREG:** I called [JACKSON's defense attorney] yesterday saying return my call, then I called, uh, I mean I texted this morning, I ain't got no response, but you know I was talking to brother and he like, nah, we can't let him do that like, he gotta, you know, he gotta take that chance, you know what I'm saying<br><br>**JACKSON:** Yeah<br><br>**GREG:** You know<br><br>**JACKSON:** Yeah, I was thinking the same thing, even if, it's a better chance, you know what I mean<br><br>**GREG:** Yeah, yeah, he was saying if you still have to wait, at least you're waiting with the right documents now |

**JACKSON:** Yeah, I was thinking the same thing, yeah, I was thinking the same thing, yep

**GREG:** You know

**JACKSON:** Yeah

**GREG:** Yeah, how he was explaining the situation like it's already done now but, if it can get better, and he still gotta wait, at least it's better

**JACKSON:** Right

**GREG:** You know what I mean

**JACKSON:** Well, you gotta go down to her office

**GREG:** Yeah, yep

**JACKSON:** OK

**GREG:** Yeah I'm just gonna go ahead and go down that because I don't know if Jearid gotta wait on Crystal to do something, but it's not even 11 yet

**JACKSON:** You know the notaries been getting out of places early you know what I'm saying

**GREG:** Not at the hospital, they have a whole section of notaries up there

**JACKSON:** Damn I really need that, um yeah, make sure that's in the in the uh, I don't know, make sure he doing it, make sure it's his it's his handwriting and all that, you know what I mean?

**GREG:** Yeah. Yeah.

**JACKSON**: And uh, and that uh, and on the handoff part, make sure that's in the blind spot or nothing, you know what I'm saying?

**GREG:** Absolutely

**JACKSON**: Down on the ground or something, and it's right there right there, I ain't gave you nothing.

**JACKSON**: Yeah, yeah, I already thought that -- Like --

**GREG**: That was that was his people going to be doing that

**JACKSON**: Yeah, but I'm just saying make sure, like –

**GREG [to IRVIN]**: I'm on the phone with brother right now. What time can we go down there?

**IRVIN**: 11?

**GREG [to IRVIN]**: You going down there at 11?

**IVRIN**: Yep. Hey brother?

**JACKSON**: Yeah?

**IRVIN**: Hey brother, we gotta go and just go get it --

**GREG**: Hey, we already talked about it –

**JACKSON**: I know, I know. That's what I was calling for.

**GREG**: Yeah, we already talked about that.

**IRVIN**: I'm going down there at 11 so by 12 I should be at mama's house.

. . . .

**JACKSON:** That's what I was calling, to make sure that's in the blind spot and all that, you know what I mean?

. . . .

**JACKSON:** Whatever, uh, whatever Jessica got, like, uh, shit, man…like, leave, uh, like leave out a couple bands or something. Just give the rest to cuz.

**GREG:** The whole thing was like knowing the situation without knowing anything I was just trying to handle the situation

31

| | | |
|---|---|---|
| | | . . . . |

56.     I believe that when JACKSON said, "On the handoff part, make sure that's in the blind spot or nothing, you know what I'm saying? . . . Down on the ground or something, and it's right there right there, I ain't gave you nothing," the "handoff" he was referring to was the first of the two payments to the Victim, and, by "blind spot," he meant an area where the hospital's security cameras would not capture it. This is consistent with what CW-1 told law enforcement, discussed above, which was that the Victim told him/her that IRVIN delivered the affidavit to the Victim in the hospital.

57.     Later the same day, JACKSON and G. JACKSON (GREG)[12] appeared to discuss the fact that IRVIN had picked up the affidavit from JACKSON's defense attorney's office:[13]

| Date | Dialed # | Content |
|---|---|---|
| 10/30/19<br><br>5:16<br>p.m. | 513-545-0214<br><br>(G.<br>JACKSON) | **GREG:** So uh he, he picked it up from [Jackson's defense attorney] today. Couldn't take it over there today because uh homeboy's brother was at work. They're gonna meet first thing in the morning.<br><br>**JACKSON:** Okay…. oh okay… that's what's up<br><br>**GREG:** Yeah<br><br>**JACKSON:** You still at mama's?<br><br>**GREG:** Nah, I'm at the house |

---

[12] The phone number 513-545-0214 is saved in BROWN's phone under the name "Greg."

[13] This particular call was placed under JACKSON's PIN.

58. Less than an hour later, JACKSON used another inmate's PIN to call G. JACKSON (GREG) back. They again appeared to discuss paying off the Victim at the hospital:

| Date | Dialed # | Content |
|------|----------|---------|
| 10/30/19 at 6:03 p.m. | 513-545-0214 (G. JACKSON) | **JACKSON:** Where you at? Mama's house? <br><br> **GREG:** Nah, at home. <br><br> **JACKSON:** OK. <br><br> [. . .] <br><br> **GREG:** Tomorrow'll be another morning. [U/I] got some good news, when you be calling around tomorrow. <br><br> **JACKSON:** Did you holla at [U/I] and tell him what I said for that -- <br><br> **GREG:** Yeah – <br><br> **JACKSON:** -- the blind spot and all that? <br><br> **GREG:** Yeah <br><br> **JACKSON:** Make sure it ain't no wham-bam, "That ain't mine, uh!" <br><br> **GREG:** Right, yeah – he already know it, he already know it. <br><br> **JACKSON:** Yeah. <br><br> **GREG:** Yep. <br><br> **JACKSON:** Yeah, [U/I] out of here. Nope. Everything should be cool by tomorrow – nah – He don't know when [Jackson's defense attorney] gonna be able to get with my PO, though <br><br> **GREG:** Nah, but see, that's what I wanted him to do. Before you give it to [Jackson's defense attorney], go make a copy, and we can go fax the dude ourselves. You know, I know it'll be better coming from him; |

33

I just don't want to wait on her. Don't want to look like nothing made-up or nothing.

**JACKSON:** I wonder… I wonder what's the procedure with that, though.

**GREG:** Yeah, you might to just still have a hearing there, and that's what I said. You might have to just pay the bond anyway, to get you transferred after that.

**JACKSON:** Yeah

. . .

**GREG:** But then again, [Jackson's defense attorney] might not want that.

**JACKSON:** Yeah, that's what I was saying. Yeah because I know she ain't trying to lie all the way up there –

**GREG:** Yeah, she don't want no part for them.

**JACKSON:** Yeah, that's where I'm at with it. But if it's gonna guarantee out there, then shit. If she —

**GREG:** Yeah, like [redacted][14] said, the probation officer said, um, he took the situation to his supervisor, so his supervisor making the decision right now, but ultimate the decision to lift the holder is up to him.

. . . .

**JACKSON:** Brother didn't say what time tomorrow, huh?

**GREG:** Nah, he just said tomorrow morning, because he gotta do it before he go to work, they go to work.

---

[14] G. JACKSON used the first name of a woman here. Because this woman is not presently a subject of the criminal investigation, I have redacted it to protect her privacy.

34

59.     Later the same night, JACKSON called BROWN using another inmate's PIN, and the two discussed their finances, including finding money to pay off bills and giving money to JACKSON's brother. Based on context, including other calls I describe below, I believe JACKSON was instructing BROWN to gather money to give to G. JACKSON (GREG), which G. JACKSON would then give to the Victim:

| Date | Dialed  # | Content |
|------|-----------|---------|
| 10/30/19 at 7:54 p.m. | 513-212-5895 (BROWN) | **JACKSON:** Trying to think how I want to do this. Is it 10, 11 – like – nothing extra? Like, you got some in your purse? You cool?<br><br>**BROWN**: Yeah. I been working every day. [U/I]<br><br>**JACKSON**: What I'm saying, 'cuz . . .  what bills need to be, what bills due?<br><br>**BROWN**: [U/I]<br><br>**JACKSON**: That's on the 18th.<br><br>**BROWN**:  Oh, ok. [U/I]<br><br>**JACKSON**: Then it's time for Boost Mobile, too.<br><br>**BROWN**: That's like 30.<br><br>**JACKSON**: Nah, my mama's 26, Jearid 26, and then –<br><br>**BROWN**: I already paid that. With the ten dollars off.<br><br>**JACKSON**: Ah, well. Ain't nothing coming up –<br><br>. . . .<br><br>**JACKSON**: So look, take that ten, right, and give it to my brother.<br><br>**BROWN**:  Uh huh. |

| | | |
|---|---|---|
| | | **JACKSON**: Or, you can - uh, yeah, give it to my brother and tell him I said, "[U/I] cuz, use that for [U/I]"<br><br>**BROWN**: Okay.<br><br>**JACKSON**: You hear me?<br><br>**BROWN**: Uh huh.<br><br>**JACKSON**: And then whatever you making off the other cases of CDs that you got, you just put that toward the bills and stuff like that. |

60.     Because of the evidence that G. JACKSON and IRVIN paid off the Victim on October 31, 2019 (including additional calls I describe below), I believe that on this call from October 30, 2019 when JACKSON told BROWN to give "ten" to his "brother," he meant that BROWN should give $10,000 to G. JACKSON.

61.     The next morning, on October 31, 2019, G. JACKSON appeared to tell JACKSON that the affidavit had been signed. Based on context, I believe that, in the excerpt below from a jail call JACKSON placed using another inmate's PIN, the two were discussing how the Victim wanted both payments now, not just the first payment; JACKSON considered this to be "extortion":

| Date | Dialed # | Content |
|---|---|---|
| 10/31/19<br><br>2:07 p.m. | 513-545-0214 (G. JACKSON) | **JACKSON**: Hello, bra.<br><br>**GREG:** What up<br><br>**JACKSON**: What's going on? |

**GREG:** Nothing. Everything got done. [Jackson's defense attorney] got the paperwork but, see I told him what it was gonna be. You know what I mean?

**JACKSON:** What's that?

**GREG:** Now it's something else. You know what I'm saying?

**JACKSON:** Huh?

**GREG:** I don't know, man. Just --

**JACKSON:** I know, uh –

**GREG:** They didn't say that, they said this. You know what I'm saying, like?

**JACKSON:** uh – I don't under – I don't. I mean, [Jackson's defense attorney] just left from seeing me too.

**GREG:** what'd she say?

**JACKSON:** She wasn't saying nothing. She was just saying whenever she gets the paper, she can give it to my PO and see how that works, see if they can lift the holder.

**GREG:** Yeah, she got it now. The secretary got it for her.

**JACKSON:** You can call her and let her know . . .she was saying she gonna try to see if they can lift the holder and I can get a bond or whatever. She was saying I might have to sit here until February or something like that. She's saying if they lift the holder or whatever we can go to a bail bondsman or some shit.

. . . .

**JACKSON:** Jessica will be here at 4. So I guess you can let her know if you need her to tell me something, she'll tell me.

. . . .

**JACKSON:** So basically they was trying to say that wasn't that right there?

37

**GREG:** Right! And he said, he, [redacted][15] said he said, "Then why would I have that, if that wasn't what it was? Why wouldn't I have anything else?"

**JACKSON**: Right. Like I said, they went on and did it, though, huh?

**GREG:** Yeah, he gave him his word, you know…if the, the other one.

**JACKSON**: Oh, when it's, when it's over with?

**GREG:** Nah, he was saying *before*, like.

**JACKSON**: Nah, that's trippin'.

**GREG:** Yeah. Like.

**JACKSON**: He trippin'.

**GREG:** Yeah, like… he in control of the situation out there. I mean, if that's how you want to feel, you know what I'm saying?

**JACKSON**: [U/I]

**GREG:** That just means nobody learn nothing, man, it's just like.

**JACKSON**: Yeah.

**GREG:** Unfortunate situation.

**JACKSON**: They're fuckin' extortin', you know what I mean. Trying to extort a motherfucker. They trippin'

**GREG:** Yeah.

**JACKSON**: The brother crossed his T's and dotted his I's, though?

---

[15] G. JACKSON (GREG) used a nickname here. I have redacted the nickname because this individual is not presently a subject of this criminal investigation.

| | | |
|---|---|---|
| | | **GREG:** He did. Yeah. |
| | | **JACKSON**: They trippin', man. I don't know, man. I guess when Jessica get here I'll be able to talk to her. |

62.     When G.JACKSON (GREG) said, "Yeah, he gave him his word, you know…if the, the other one," and JACKSON responded, "Oh, when it's, when it's over with?", I believe they were talking about the second payoff payment. When GREG responded, "Nah, he was saying *before*, like," he meant that the Victim wanted the second payment before JACKSON's case was finished.

63.     Several weeks later, on November 14, 2019, JACKSON called G. JACKSON using another inmate's PIN to discuss his legal strategy and his new defense attorney, whom he had just retained after his previous defense attorney passed away:

| Date | Dialed # | Content |
|---|---|---|
| 11/14/19 at 11:08 a.m. | 513-545-0214 (G. JACKSON) | **JACKSON**: [Jackson's new defense attorney] said he gonna file a motion to suppress identity, he's gonna do that ASAP.<br><br>**GREG**:  Did you tell him about the signed affidavit?<br><br>**JACKSON**: Yeah, yep, I told him about that, and he said he'd need a copy of that and all that stuff. |

64.     As discussed in an earlier section above, JACKSON's new defense attorney subsequently filed a copy of the Victim's affidavit as part of a motion to dismiss/motion to suppress the identification.

## K. Electronic and physical surveillance suggests that IRVIN currently resides at the PREMISES.

65.     In February 2021 I executed a search warrant for prospective cellular location data[16] relating to IRVIN's number 513-953-5123. As noted above, this phone number was saved under the name "Jearid" in BROWN's phone, and the context of messages exchanged between this number and BROWN, described above, leads me to believe that IRVIN uses it. Based on the results of prospective cellular location data relating to the cell phone assigned call number 513-953-5123, I learned that this phone is frequently at the PREMISES overnight, leading me to believe that IRVIN resides at the PREMISES. I also consulted law enforcement databases and learned that IRVIN has listed the PREMISES as his address. Moreover, through electronic and physical surveillance, I am aware that IRVIN and IRVIN's significant other both park the vehicles they use in the driveway connected to the PREMISES. Finally, I have seen IRVIN leave the PREMISES within the past month. For these reasons, I believe IRVIN resides at the PREMISES, and that his personal effects are located there.

---

[16] The Honorable Karen L. Litkovitz signed warrant 1:21-MJ-96 pm February 1, 2021.

66.     I know, based on my training and experience, that modern cell phones serve many functions, such as "wallets," and contain a vast amount of highly personal data, such as web history, text messages, call logs, photographs, and other materials. Therefore, individuals typically carry cell phones with them at all times, or keep them secured nearby. For this reason, I believe that IRVIN likely keeps his cell phone on his person or nearby when he is at the PREMISES, and takes it with him whenever he leaves.

67.     I also know, based on my training and experience, that it is common for inmates to send letters to those outside the jail because the contents of those letters are not monitored, whereas inmates are explicitly told that their phone calls are being recorded. For this reason, inmates often include more explicit information relating to their criminal activity in letters that they would not reveal over the phone. Because I know that people keep personal letters in their homes, I believe that IRVIN may have letters from JACKSON at the PREMISES.

68.     Based on the foregoing jail calls and the other evidence described above—including evidence that JACKSON's brother IRVIN was one of the men who provided the affidavit to the Victim in the hospital, and that, based on the text messages showing G. JACKSON's involvement in the scheme to pay off the Victim, G. JACKSON may have been the other individual—there is probable cause to believe that BROWN, JACKSON, IRVIN, G. JACKSON, and other conspirators are engaged in a conspiracy to obstruct justice by paying the Victim to recant his identification of JACKSON as the shooter. Based on the evidence described

41

above, including the jail calls, text messages between BROWN and the Victim about a payoff from G. JACKSON, BROWN's misrepresentation to the grand jury regarding her relationship with G. JACKSON and IRVIN, and BROWN's misrepresentation to the grand jury about her Facebook account, there is also probable cause to believe that BROWN, the Victim, IRVIN, and G. JACKSON have been meeting and communicating in connection with the scheme. For this reason, I believe there is probable cause to search the PREMISES for evidence of this scheme, including any electronic storage medium (such as a cell phone or computer) in IRVIN's possession that may contain records of these communications.

**L.      The Victim has attempted to evade law enforcement and to avoid testifying in this matter, suggesting the scheme is ongoing.**

69.      As noted above, BROWN and the Victim were communicating as recently as October 2020—mere days before BROWN's phone was seized—about what appears to be a scheme in which JACKSON, BROWN, IRVIN, and G. JACKSON paid the Victim to recant his identification of JACKSON as the shooting.

70.      The federal case against JACKSON remains pending, with a jury trial currently set on March 22, 2021. Law enforcement agents have been unable to serve the Victim with a subpoena to testify at trial, in part because the Victim previously provided law enforcement with a fake phone number. Additionally, the texts set out above lead me to believe that the Victim is still awaiting another $8,000 payment from the coconspirators. I believe, based on these facts and others described above, that the scheme is ongoing and that the Victim still intends to avoid

42

testifying against JACKSON or to testify falsely that JACKSON was not the shooter. Because

the scheme is likely ongoing, and because the Victim may receive another payment from the

coconspirators (which, in my training and experience, is unlikely to be an electronic payment,

which is traceable), I further believe that the Victim is likely still in contact with BROWN, G.

JACKSON, IRVIN, and other coconspirators and that the suspects are likely meeting in person

in connection with the scheme. I also believe that IRVIN, G. JACKSON, and BROWN, as well

as other conspirators, are in contact about the ongoing scheme.

## TECHNICAL TERMS

71.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

   a. Storage medium: A storage medium is any physical object upon which computer

      data can be recorded.  Examples include hard disks, RAM, floppy disks, flash

      memory, CD-ROMs, cell phones, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

72.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the PREMISES, in whatever form they are found.  One

form in which the records might be found is data stored on a computer's hard drive or other

storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage

43

media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

73.  *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

74.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a

file (such as a paragraph that has been deleted from a word processing file).
Virtual memory paging systems can leave traces of information on the storage
medium that show what tasks and processes were recently active.  Web browsers,
e-mail programs, and chat programs store configuration information on the
storage medium that can reveal information such as online nicknames and
passwords.  Operating systems can record additional information, such as the
attachment of peripherals, the attachment of USB flash storage devices or other
external storage media, and the times the computer was in use. Computer file
systems can record information about the dates files were created and the
sequence in which they were created, although this information can later be
falsified.

b.  As explained herein, information stored within a computer and other electronic
storage media may provide crucial evidence of the "who, what, why, when,
where, and how" of the criminal conduct under investigation, thus enabling the
United States to establish and prove each element or alternatively, to exclude the
innocent from further suspicion.  In my training and experience, information
stored within a computer or storage media (e.g., registry information,
communications, images and movies, transactional information, records of
session times and durations, internet history, and anti-virus, spyware, and

malware detection programs) can indicate who has used or controlled the

computer or storage media. This "user attribution" evidence is analogous to the

search for "indicia of occupancy" while executing a search warrant at a residence.

The existence or absence of anti-virus, spyware, and malware detection programs

may indicate whether the computer was remotely accessed, thus inculpating or

exculpating the computer owner. Further, computer and storage media activity

can indicate how and when the computer or storage media was accessed or used.

For example, as described herein, computers typically contain information that

log: computer user account session times and durations, computer activity

associated with user accounts, electronic storage media that connected with the

computer, and the IP addresses through which the computer accessed networks

and the internet. Such information allows investigators to understand the

chronological context of computer or electronic storage media access, use, and

events relating to the crime under investigation. Additionally, some information

stored within a computer or electronic storage media may provide crucial

evidence relating to the physical location of other evidence and the suspect. For

example, images stored on a computer may both show a particular location and

have geolocation information incorporated into its file data. Such file data

typically also contains information indicating when the file or image was created.

The existence of such image files, along with external device connection logs,

47

may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on

48

the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

75. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing

49

evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

50

76.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

77.     Because several people may share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## **CONCLUSION**

78.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

## **REQUEST FOR SEALING**

79.     It is respectfully requested that this Court issue an order sealing, until further

order of the Court, all papers submitted in support of this application, including the application

and search warrant.  I believe that sealing this document is necessary because the items and

information to be seized are relevant to an ongoing investigation into the criminal organizations

as not all of the targets of this investigation will be searched at this time.  Based upon my

training and experience, I have learned that online criminals actively search for criminal

affidavits and search warrants via the Internet, and disseminate them to other online criminals as

they deem appropriate, i.e., post them publicly online through the carding forums.  Premature

disclosure of the contents of this affidavit and related documents may have a significant and

negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

EDWARD SCHAUB
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me on     Feb. 24     , 2021.

Karen L. Litkovitz
**United States Magistrate Judge**

## ATTACHMENT A

*Property to be searched*

The property to be searched is **3501 MEADOW AVENUE, CINCINNATI, OHIO 45211,** further described as a light-colored single-family residence with a front porch and the number "3501" affixed to the front, as shown below:



**ATTACHMENT B**

*Property to be seized*

1.      All records relating to violations of  18 U.S.C. § 922(g)(1) (felon in possession of

a firearm or ammunition); 18 U.S.C. § 1623(a) (perjury); 18 U.S.C. § 1503 (obstruction of

justice); 18 U.S.C. §§  371 and 1503 (conspiracy to commit obstruction of justice); 18 U.S.C.

§ 1512(b)(2) (witness tampering); 18 U.S.C. § 1512(c)(2) (witness tampering); and 18 U.S.C.

§ 1512(k) (conspiracy to commit witness tampering), those violations involving Darias

JACKSON, Jessica BROWN, Gregory JACKSON, Jearid IRVIN, and other conspirators and

occurring on or about September 19, 2019, through the present, including:

    a.   All communications and records, in whatever form they may be—whether they

         are paper communications such as letters, audio recordings, electronic

         communications, or otherwise:

         i.   that contain evidence of Darias JACKSON, Jessica BROWN, Gregory

              JACKSON, and/or Jearid IRVIN endeavoring to influence, obstruct,

              evade, impede, or otherwise interfere with the investigation into Darias

              JACKSON's role in the shooting of A.W. on September 19, 2019;

         ii.  that contain evidence of Darias JACKSON, Jessica BROWN, Gregory

              JACKSON, and/or Jearid IRVIN engaged in a conspiracy to pay,

              influence, persuade, bribe, threaten, or otherwise communicate with A.W.

              for the purpose of getting A.W. to recant his identification of JACKSON

as the person who shot him on September 19, 2019, or to otherwise not

cooperate in criminal prosecutions and investigations;

iii. relating to the shooting of A.W. on or about September 19, 2019, near

Groesbeck Road in Cincinnati, Ohio, including any communications

relating to the incident;

iv. relating to the possession of a firearm and ammunition by Darias

JACKSON;

v. relating to communications between A.W. and Darias JACKSON,

including, but not limited to, communications related to the September

19, 2019 shooting of A.W., and communications related to obstructing,

impeding, interfering, or influencing the investigation and judicial

proceedings regarding Darias JACKSON's role in the shooting of A.W.

and possessing firearms and/or ammunition;

vi. relating to communications between A.W. and Jearid IRVIN, including,

but not limited to, communications related to the September 19, 2019

shooting of A.W., and communications related to obstructing, impeding,

interfering, or influencing the investigation and judicial proceedings

regarding Darias JACKSON's role in the shooting of A.W. and possessing

firearms and/or ammunition;

vii. relating to communications between A.W. and Gregory JACKSON,

including, but not limited to, communications related to the September

2

19, 2019 shooting of A.W., and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A.W. and possessing firearms and/or ammunition;

    viii. relating to communications between A.W. and Jessica BROWN, including, but not limited to, communications related to the September 19, 2019 shooting of A.W., and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A.W. and possessing firearms and/or ammunition;

    ix. relating to communications to or from A.W. and other third parties related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A.W. and possessing firearms and/or ammunition;

    x. regarding money used to facilitate a payoff to A.W.;

2. Any and all firearms or ammunition potentially used in or related to the commission of the shooting of A.W. on September 19, 2019.

3. U.S. currency ($1,000.00 or more) that could form the second half of the payoff still owed to A.W. in exchange for A.W.'s recantation.

4. For any computer or storage medium, including any cell phones and tablets, whose seizure is otherwise authorized by this warrant, and any computer or storage medium that

contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.   evidence of the lack of such malicious software;

    d.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

4

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

5